Case number 14-1135 at L. Consolidated Communications, Inc. Viewing business as Illinois Consolidated Telephone Company Petitioner v. National Labor Relations Board. Mr. Dumbacker for the petitioner, Mr. Heller for the respondent, and Mr. Grant for the intervener. Mr. Dumbacker. Thank you, Your Honor. I'm Robert Dumbacker representing the appellant at Consolidated Communications. The board brought this case under striker misconduct theory. The board's order reflects a fundamental misunderstanding of this test and cannot stand for the following reasons. Initially, the board committed error when it found that the blocking and preventing of a replacement employee from passing while driving on a public highway miles away from any striker picket line constituted strike activity. This was not strike activity and should not have been analyzed as such. Further, the board utterly failed to follow the established striker misconduct test that applies or the burden shifting test that applies to striker misconduct cases. Under this test, where the board finds that the company has an honest belief of misconduct, that misconduct did occur, the board must then determine whether the general counsel demonstrated that the conduct was not sufficiently serious to forfeit protection of the act. That inquiry is defined by the board's test in clear pine moldings, which provides that the misconduct is sufficiently serious to forfeit protection of the act where it reasonably tends to coerce and intimidate employees in the exercise of their rights. Can I jump ahead to the failure to bargain issue? Why aren't the facts that were found on the failure that you had Weaver's position that was eliminated and they didn't bargain over that before they eliminated it sufficient to support that aspect of the board's decision? Your Honor, the board, in our view, never provided the analysis, never analyzed and provided. What more do you need? There was a position that's not disputed. The position was eliminated. That's not disputed. It wasn't. The elimination was a bargain over. That's not disputed. What other fact do you need to find a violation? Well, Your Honor, we asserted in the proceedings that the position was not eliminated, that there were office specialist positions, that those positions continue to remain in effect. There was no. There were other ones, but that Weaver's was eliminated. She held one of the eight office specialist positions. Do you dispute that that one was eliminated? I don't dispute that there were eight and they moved to seven. I don't dispute that. So her position was eliminated, and it wasn't bargained over. I guess I'm still not understanding what other fact is needed. Again, Your Honor, we assert that the office specialist position was not eliminated. Did you assert that in your brief here? Your Honor, we did assert, I believe, that. I didn't read. Well, just show me. I believe it was in the reply brief, Your Honor. Yes. Oh, well, that's a little late. Your Honor, we chose, frankly, not to spend a lot of time on that in our briefing. All right. But do you concede then, just to follow up on Judge Millett's question, that if you didn't challenge the board's finding that the position was eliminated, that you lose on this issue? No, Your Honor. We don't believe that the board provided reasoned analysis as to why it found a violation. That's our view on that point. All right. Okay. As to the employee discipline, the board utterly failed to follow the established burden-shifting test that applies to strike or misconduct cases, as I stated. Here, the board, as I stated, the board has the general, I'm sorry, the general counsel has the burden of proof to show that the misconduct was sufficiently serious, to lose protection of the act. Is this fellow Troy Connolly, is that your strongest case, the Troy Connolly incident? Frankly, Your Honor, the board didn't apply the proper standard for any of the individuals, so we think they're all equally strong. And let me explain. As to Mr. Connolly, the general counsel resolved a burden of, I'm sorry, the board resolved a burden of proof against or consolidated on an issue the general counsel had the burden on. Second, although it found that each of the discipline employees engaged in misconduct, it failed to answer the ultimate question under clear pine moldings for each of those misconducts, which is whether or not that misconduct reasonably tended to coercion. Take the Connolly case and Hudson. The ALJ said, I agree with you that he stated the principle wrong here, but he said, quote, Hudson engaged in no illegal or dangerous conduct that would violate consolidated workplace violence policy. That's what he held. What more did he need to do? That's not the test. The test is whether or not Ms. Hudson's conduct reasonably tended to coerce or intimidate under the circumstances. But if he didn't engage in any illegal or dangerous conduct that violated the company's policy, what else is left? Isn't that the end of it? No, Your Honor. The board has held and this court has held, the judge found that Ms. Hudson blocked Mr. Connolly, despite Ms. Hudson's denials. At that point, the question is, did that misconduct, the blocking, reasonably tend to coerce or intimidate? That question was never actually answered. The fact that there's violence, that the board found that in its opinion there was no violence, that's not the question. But didn't the company discipline these people because they violated the company's policy against violence? Wasn't that the basis for the discipline? Actually, as to Ms. Hudson, they cited both the company's policy, off-the-work premises policy, and the company's violence policy. So they cited both, and that policy is the former is very broad and implicates public safety. But weren't they, I'm not sure what you mean by off-site. Weren't there several sites, this company had several facilities, correct? Yes, Your Honor. And didn't the testimony say that Hudson and whoever was with her, they were following him to find out whether they needed to engage in picketing at another site, right? That's what they initially stated they did. And that's what the ALJ found. Initially, however, at the time, ultimately what the ALJ found was that Ms. Hudson inexplicably, or as he termed it, peculiarly, drove in front of Mr. Conley, blocked his progress. Ms. Hudson specifically testified at Joint Appendix 518 that when she passed Mr. Conley, prior to engaging in the blocking that the judge found occurred, that she abandoned it. She had no further intent to follow Mr. Conley. At that point, she was no longer, to the extent she was engaged in any investigating opportunities for ambulatory picketing prior to that, at that point she no longer was engaged in the course of any protected activity. I was curious about one thing, was that you have three incidents within one hour where Ms. Hudson's car ends up in the front of people, workers or management, and independent allegations from all three within that same hour that she was blocking them in. Did the ALJ grapple with, or did you argue that in analyzing her conduct, the sort of fact that there was this pattern within a single hour of three incidents of very similar behavior, albeit in different locations, involving independent people who presumably didn't talk to each other in the meantime, and all of which had witnesses, should be looked at collectively in evaluating her credibility and her role, her behavior? I believe we did argue that the circumstances dictated that Ms. Hudson, or suggested that Ms. Hudson had an intent to engage in this type of activity throughout the day. Her car just keeps showing up within one hour. Exactly, yeah, as do three different people. And the ALJ didn't address that at all? No, Your Honor, the ALJ didn't address many of the circumstances in this case. Does that affect the analysis of the nature of her conduct or misconduct, or does that affect her credibility? I think it affects both. I'm sorry. It affects, it can affect the credibility, but I think as to her conduct, it doesn't affect, I think, the analysis as to whether or not she was engaged in the course of protected activity when she chose to block Mr. Conley after she testified that she had no intent to follow him. Are there other cases holding that, applying the law about following someone to another picket site, or another site for potential picketing where the people didn't follow the person ever? That seemed odd to me, that he kept talking about following him to the picketing site, but they were both in front of him. Exactly. When he left the road, nobody bothered to follow him to see if they should picket. But are there, maybe this just sometimes happens, that you get one person in front and they sort of, I don't know. No, we're not aware of any circumstances like this. I'm not aware of any circumstances where an employee claims they're following a replacement employee to travel to a picket site. They suddenly abandon that purpose for whatever reason. They admit that they abandon that purpose. They engage in blocking, and then they inexplicably turn around and go back to the corporate site. So your argument is that you want us to set aside these ALJ findings as either not supported by substantial evidence or question the credibility findings, right? No, Your Honor. No? No. Your Honor, what I'm here to talk about today is the failure to apply the standard. That's not what you just sounded like in response to Judge Millett. Okay, Your Honor. It sounded like you were telling us that his findings weren't supported by substantial evidence and that you questioned his credibility findings, and there's a lot of that in your brief. Yeah, sure. We made some of those arguments, but I think at the core of this case is a fundamental misunderstanding of the strike or misconduct test. This judge found misconduct occurred by each of the three disciplined employees. He never asked, and the board never changed that ruling, never asked whether or not that misconduct reasonably tended to coerce or intimidate under the circumstances. I guess if that's your focus, your argument, but you're not abandoning your argument about lack of even-handedness in his credibility rules, right? We're not abandoning that, but this judge's ruling was permeated with a failure to ask that ultimate question or clarify moments. You will not find that determination of whether the conduct reasonably tended to coerce or intimidate under the circumstances. You will not find analysis of that anywhere in the decision. In fact, he focused on things, on issues such as did the violence occur, was it violent in his view, Hudson's disciplinary history, Hudson's tenure at the company. One problem with that focus, it seems to me, is that the board doesn't adopt the ALJ's findings wholesale. The board actually finds that a lot of this misconduct did not occur. Your Honor, what the ALJ found, what the board adopted, was that there was misconduct. And again, this is assuming that the Connelly incident was strike activity, which we strongly dispute. But they found that Ms. Hudson engaged in impeding. They found that Mr. Williamson engaged in a crotch-grabbing incident. My understanding is there were several incidents. They ended up finding that two of them occurred. The rest, they decided, had not occurred at all. And so, I guess part of our question is, if the board doesn't adopt the findings of the ALJ, then are they also... No, Your Honor, because here, the board did find that misconduct occurred. They didn't find that all the misconduct occurred. In that case, the board has applied, and the circuit courts have as well. They have looked at the misconduct that did occur and asked whether or not that misconduct reasonably tended to coerce or intimidate. Okay, so but where does, and this is just a question, where does the board's consideration of whether or not the conduct was egregious enough to justify the discipline, where does that come in? That comes in after they find that the misconduct occurred. Okay, so but... And we studied the case Roto-Rooter from the board case that applies that principle. They found that two, I think it was two or three of the incidents of the five that the employee was informed on. They looked at that question. Two cases cited by the board did a similar analysis, PRC recording and Hotel Relinook. I guess what I'm trying to understand is the board dismisses most of this. It finds that two of these incidents perhaps did occur, and then it says, but they weren't bad enough to justify the discipline that the company imposed. So once they find that it wasn't bad enough, where do they apply the standard about whether it was coercive? In other words, if they're saying it's not egregious, then perhaps that means it also couldn't have risen to the level where it would coerce or intimidate. Or do they have to make that finding separately? So once they found that the misconduct occurred, whatever misconduct they found occurred, they need to ask, did that conduct reasonably tend to coerce or intimidate? That's the clarifying... Take the one case, or one of the two cases where they did find that it occurred. You mentioned it already, the crotch-grabbing case. Yeah. Didn't they go right ahead and then explain that? No. They said, well, they said, we don't have any cases that support losing the axe protection in cases like here. And then they cite this arrow-casting case of their own, which says that use of obscene language and gestures, standing alone, without threat of violence, does not rise to the level where the employee loses the axe protection. What more are they supposed to say? Your Honor, in that case, in the Williamson crotch-grabbing incident, the operative language for the reason the board found that Consolidated violated the act was that they applied the right-line test. He concluded that because Respondent, Consolidated, did not prove that it would have suspended Mr. Williamson solely on the basis of the crotch-grabbing incident, that it violated the act. That's the clear language on board page 13. The above inquiry that you cited isn't the appropriate inquiry. Again, the question is, did it reasonably tend to coerce or intimidate? He didn't apply that here. He certainly didn't apply that to the Conley incident, assuming that was right in this context. The board cites cases which says that, absent something more, obscene gestures don't intimidate. Isn't that the board's law? I'm sorry, Your Honor? Isn't that what the board's case law says? Your Honor, each case, what the board's case law says in Clarifying Holdings and Universal Trust, is that each case needs to be analyzed under the circumstances. Here, we had testimony about Williamson crowding cars. We had a number of circumstances. They never asked that question. We never got an answer to the question, whether they truly, thought it reasonably tended to coerce or intimidate under the circumstances. And then finally, I'll just add that Mr. Maxwell, it was found that Mr. Maxwell intimidated.  Okay, we'll hear from the board.  Thank you. Good morning. May it please the Court. Joel Heller for the National Labor Relations Board. As Judge Brown was just talking, the board actually found that most of the alleged misconduct did not, in fact, occur. And once the board has found that the misconduct, alleged misconduct, did not, in fact, occur, there is no subsequent egregiousness analysis because the misconduct did not occur. So it's only when the board finds that the alleged misconduct did occur that it engages in the Clear Pine Holdings analysis, whether the conduct was reasonably tended to coerce or intimidate. So as to Maxwell, as to Hudson, and as to the Williamson incident with the mirror, the board found that none of those alleged misconducts, excuse me, none of that alleged misconduct occurred. As to the Williamson incident with the cross-grabbing, the board then did engage in the Clear Pine Holdings analysis. And as Judge Tatel was mentioning, it is the board's law that a single obscene gesture by itself is not sufficient to cause an employee to lose the protection of the act. Was it a single obscene gesture? What about a single obscene sexually demeaning gesture targeted at somebody of the opposite sex? Have you heard that before? Again, if you look at the case society in our brief, Gloversville and Bossing, Wainstead-Cadillac, there were some obscene sexually themed gestures that the board found did not cause... Is that supposed to persuade her not to support the strike? I don't think so. Well, this is in the context of a strike. And there is more leeway given. This is not... It's a different standard for evaluating conduct in the context of a strike than it is for conduct in the workplace. Well, I get that. People are heated. There's heated exchange. People are upset, angry. There's enormous amounts of tension. But this strikes me as a different category of behavior. Well, it is... I'm just trying to figure out what on earth is wrong. Well, the other stuff you can see, they're arguing about what they're upset about. But this seemed to be... He was facing her from across the parking lot. She had just crossed a picket line. He was certainly expressing his dissatisfaction. He yelled out, scab, at the same time, which is, of course, related to the strike context. And this is not, as the ALJ makes clear, this is not conduct that is meant to... We're not meant to encourage this conduct. But it's not enough to meet the standard of whether it reasonably tended to coerce or intimidate. If you look at, by contrast, universal trust, which consolidated sites, that's... What did he mean by it if he didn't mean to intimidate her for crossing the line? He meant, I don't know what he was thinking. I imagine he was meaning to express his dissatisfaction with that she was crossing a picket line and going to work. In determining whether it was coercive or intimidating, do we look at it from the viewpoint of the perpetrator or the person who's on the receiving end of the message? Well, it's an objective standard, so you're not... Objective from which point? A reasonable perpetrator or a reasonable audience member? I believe it's with a reasonably... A reasonable employee who is the recipient, I suppose, of the gesture. Would it tend to coerce or intimidate a reasonable employee? Right, in an objective standard there. Did the board make the same finding with respect to the Conley incident? Because I think they did agree that that probably happened. The board engaged in the clarifying holdings egregiousness analysis as to the Conley incident, assuming that it happened. There was no express finding one way or the other as to whether it happened as alleged. But I think if you look at the board's factual findings of what actually happened, and you compare that to other cases in which there are strikers and non-strikers driving, it's clear on what side of the line this conduct falls. Again, it's a question of factual findings and credibility determinations at this point. And the board found that Hudson was driving in front of them for approximately one mile and one minute. Hudson testified without contradiction that she was driving the speed limit the entire time. And both Conley and Diggs, who was this passenger, testified that there was not a risk of an accident. They were not at risk of hitting her. So I don't think that driving the legally mandated speed limit can be characterized as extremely dangerous vehicular activity, which was the stated basis for Hudson's discharge. Doesn't it have to be extremely dangerous vehicular activity? After all, this involves more than just the strikers and the people that they're upset with. The public uses the highway. Sure. That was the stated basis for Hudson's discharge. So if you're looking as to whether the misconduct occurred, then you look at what she was actually alleged was doing. And also, so no, if you're looking in the egregiousness, sorry. Well, there's something about this that I don't understand, because the board is looking at what did the company say was the basis for the action that they took. But what counsel says is the real standard here is did the action that occurred have the effect of coercing or could it have had the effect of coercing and intimidating employees who chose not to strike? Well, again, Consolidate is blurring the line here. There's the question of whether the alleged misconduct occurred, and that's where you look at what Consolidate actually listed as the basis for the discharge. It's only if you determine that it did, in fact, occur that you go to that next question, the clear-planned moldings, egregiousness, excuse me, standard. And at that point, it's the board's standard, and it's not necessarily how they described it. So this is helpful, because I'm assuming that what the board is saying here is not that she was not driving this way and that they were not blocking him in, but that they found that not to be workplace violence, and therefore the incident did not occur. Am I understanding that correctly? It did not occur as alleged. Yes, the board found that Hudson was driving in front of Connolly. That is not a disputed fact. But you look at how she was driving. She was driving the speed limit. It only happened for a relatively short period, and it's those questions that show that it was not this extremely dangerous activity as alleged. Well, it wasn't just blocking in. When they pulled over, let three cars go by, and then jumped back out as soon as he tried to pass. We've seen this stuff on roads. This can be very dangerous. The fact that he was driving carefully enough that he didn't almost run into the rear end of her doesn't mean that her behavior was not reckless. Fine, if I may answer. She pulled in front of Connolly after the other cars passed, but the board found that she did not endanger him. She was, according to Diggs' own testimony, the passenger in the car, in Connolly's truck. But didn't the board go on on that one and say that even if all this happened, it wasn't sufficiently egregious to justify discipline? Yes, in the Connolly incident, they did find, assuming. And, of course, for the board's reason, the state. What do we do with the fact that the board, understandably, chose not to rely on the ALJ's, the aspect of its credibility determination that because he was a manager, he necessarily would have been angry about this? Right, the board did not rely on that. The board did not rely on that. But then what are we left with? We're left with the ALJ relying very heavily, in his own words, very significantly, relying very persuasively on the fact that he didn't call the police. Right, that is. What has that got to do with this? It goes to credibility in this instance because Connolly has alleged that he witnessed very dangerous driving on the highway, what could be illegal activity. And it undermines someone's credibility who alleged that they saw unlawful activity, that they did not report that unlawful activity to the police. But you didn't do that with Mr. Maxwell when he says he was hit twice by a car. One would think he would call the police too. It's a different scenario because the car that hit Maxwell was inching forward at a very slow speed. Well, and they didn't have a real accident. And so, I mean, I don't understand how they treat this as an incredibly important factor. It certainly was treated as an important factor. It's not the only factor. No, well, they've gotten rid of the business manager thing, that's out. Right, but you also look at- There's not even an application of the failure to call the police. The ALJ keeps relying on the fact that the company told him to call the police, but they didn't tell him to call the police. Well, they did call. I mean, if you look at the Huffmaster guidelines at JA 60 through 62, which were provided for all of the non-strikers- I'm happy to look at that, but on page 59 they say, report any incidents to the command center. Right. Consolidated says report it to the command center. Huffmaster says report it to the police. Those are not usually exclusive. That's not what the JA says. The JA says security procedures off-premise parking, which wasn't this issue, call that into the police. But this wasn't off-premise parking. But it also says if you were followed off-site to report to a police station. That's under the heading of off-premise parking. And when you have the threats on the next page, is it work threat, contact security personnel. If it's a home threat, call the police. So there's nothing here that said he was supposed to. His employer wasn't requiring him to call the police in this incident. I thought that there was, maybe I'm wrong, I thought that there was a statement not just related to off-site parking, but when you are followed off-site to call the police. And that is not exclusive to reporting it to consolidated. Because, for example, there are several witnesses that filled out both a consolidated incident report and a Huffmaster report. You can do both. We've gotten rid of the management thing. You've got the reliance on the police. Failure to call the police. Very, very important, apparently, to this ALJ. But only in this one incidence. And then you've got him saying there wasn't violence, but that violates clear pine molding. So I'm trying to figure what is left once the board took out the management factor. What is left? Well, if you're looking at the credibility, you can look at footnote 16 of the board's decision on page 8, in which they discuss how there were differences in Conley's testimony at the hearing than with his contemporaneous reports at the time, and that is a reason for discrediting the later reports. But there were all kinds of inconsistencies in Hudson's testimony, including she didn't say he brought it in, but he found that. Sorry, Hudson did not file a contemporaneous report, so that's where the inconsistency is. The board placed more reliance on what happened immediately or what was reported immediately afterwards than what was reported down the line. But, of course, also in the Conley incident, it's not just based on discrediting Conley. It's also based on crediting Hudson's uncontradicted account that she was driving the speed limit, Conley and Diggs' own testimony that they were not at risk of an accident. If you drove the speed limit on the Beltway, what would happen? How dangerous that might actually be? Well, it might be annoying when someone is driving in front of you in the left lane. Not annoying. I mean, the failure to go at speed and to block somebody in when he's trying to pass. There's two cars parallel right next to each other, not just one. For approximately one minute. It's a long mile. I've had people do this to me. It's a long mile. It's a long minute and a long mile. Well, the... It's a dangerous minute and a dangerous mile. Potentially dangerous. They were not at risk of hitting him. It was... That's because he's a good driver, I guess. Well, there was... What's that got to do with their behavior? It shows that it was not so egregious as to lose the protection of the act. I mean, it's driving the legally mandated speed limit, I don't think, can deprive you of your rights under the National Labor Relations Act. But the board here looks at every inconsistency on the part of company witnesses. At the same time, they don't seem to pay any attention at all to what's happening with the employee witnesses. For instance, it's my understanding that before this discipline took place, the employees had an opportunity to explain what had happened. Correct? They had a meeting with the employees before they were disciplined. It's not clear how much information those employees were actually given, so they weren't sure what they had to respond to. But... So how do we know that? I mean, what I read when I read this was that they didn't respond, and yet there were apparently all these innocent explanations. So why wouldn't that go to their credibility? Well, first of all, some of them did respond. I believe Maxwell responded and gave his side of the story at the time. Hudson did not. I think that's right. Hudson did not. But again, she was not given a full picture. The union asked in advance for the investigation for the basis of these allegations, and they were not provided with anything. They came into the meeting, and they were given these talking points as to what they were doing, as to what they were disciplined for. And I think that... Well, ultimately the question is, does substantial evidence support the board's version of the facts? And whether the credibility determinations... I mean, yes, it could go to credibility, but there's plenty of other incidents that do go to credibility, such as the inconsistencies. And we don't make this court's high standard of patently unsupportable or hopelessly incredible for overturning the board's credibility. Is it legal error to have a rule that you're applying but not to apply it even-handedly to witnesses? Is that just a credibility judgment, or is that actually legal error to not apply a rule even-handedly? I don't think there was a rule that was not applied even-handedly. How do you hypothesize a situation where an ALJ doesn't apply a rule, a credibility rule, even-handedly? Is that legal error? Well, it's a difficult question to answer in the abstract. I think that... I mean, it is a problem if there is clearly... You know, if there is obviously... for the administrative law judge, and I suppose... I didn't want to go to bias. I just want to know whether it's legal error to have credibility rules that you don't apply even-handedly. I think once you get to an extreme instance of that, yes, it could be a legal error, but I don't think that's what happened here. I mean, there are points in which he credits Conley. He credited Conley that he was behind, that he was driving behind Hudson in the left lane. And there are... Right, I think... If you get to a more extreme example, yes, that could be a legal error, but for the most part, credibility determinations are for an administrative law judge who is seeing the witnesses, who sees their demeanor, who can compare the contemporaneous reports with what's the embellished accounts that are given at the hearing, and can make a determination based on all of that. I'm seeing well over time, so if there are any other... Not any other questions. You're done? Okay, sit down. Thank you. Thank you. Council, any time left? There's an interviewer. Thank you. Someone's paying attention. Sorry. I didn't mean to squeeze you for this. May I please record? We're actually very anxious to hear from you. My name is Chris Grant. I represent the union in this matter. Let me just try to answer maybe some of the questions that Judge Millett had. On the Troy Conley incident, the ALJ did recognize, as Mr. Heller mentioned this, did recognize that... And he actually credited Mr. Conley, to say that Ms. Hudson was in front of her for a period of time, for a minute. And so he did engage in some credibility resolutions against the union there. Ms. Hudson's testimony was different than the judge found. But then the judge went further, and if you look at page 7 of his decision, he did talk about how he resolved the credibility. And he looked at the basis of the testimony of the respondents' witnesses, the lack of detail, the fact that they couldn't indicate where on the road, on the highway where Ms. Hudson and Ms. Weaver passed them, the fact that their accounts or testimony was inconsistent with the contemporaneous reports that they gave, the fact that their testimony conflicted. The two witnesses, the company witnesses, Mr. Conley and Mr. Diggs, the fact that their testimony conflicted. And in fact, that Mr. Diggs testified that despite Mr. Conley's accusation, Ms. Hudson did not come close to causing an accident out there. And so the ALJ, yes, there's conflicting testimony, as there always is in these cases. And if it was just a matter of there's conflicting testimony, the union witnesses must be disbelieved, then that would be if there was any, in any case, the union could not prevail. So they struggled here. The ALJ struggled with this evidence and looked at multiple factors and ultimately resolved the credibility against the company witnesses, which is something that this court has loathed so for Turin, as it's said over and over and over again in VICO products. Can I ask you something about the Williamson's crotch-grabbing incident? In evaluating whether he lost the protection of the act, the ALJ and the board kept relying on discharge cases. And I'm wondering why the law doesn't require looking at sort of the nature. It was only a two-day suspension. It seems to be materially different. I shouldn't think anyone would think from being discharged. And so when you look at the conduct, why don't you have to factor in the sanction as well in determining whether the employer, by imposing that very limited sanction for this conduct, crossed the line into sanctioning them for engaging in protected behavior rather than sanctioning them for unprotected behavior? Sure. And if I may answer, there is, yes, most of the cases that the board deal with discharge. I don't think there can be much of a distinction, though, if the employer applies a lower level of discipline, a two-day suspension, a three-day suspension, as opposed to discharge. For one, I think the effect is still a restriction or discipline that discriminates based upon an employee's exercise of their right under the act to strike. And whether it's a two-day suspension, a written warning, a 30-day suspension, or discharge, the effect is the same. And I think the board has made its decision and its expertise. We're not going to make these granular judgments about, well, does a two-day suspension restrict someone's right less than a discharge? So I think these cases, although they speak all to discharge, their reasoning applies to a suspension. Thank you. Thank you. So, yes, out of 10? Okay, would you like to take a minute? Okay, go ahead. Sure. Thank you. Just very quickly, the board's statement that you look at whether all the misconduct occurred is not accurate. We cite Fifth Circuit case, Sixth Circuit case, Roto-Rooter. It's just not accurate. In any event, the company did tell Mr. Kahn, the union at Hudson's termination meeting, that she was terminated for blocking, and that's exactly what the judge found. As to the idea that Ms. Hudson drove the speed limit, the actual testimony was that Conley drove 69 miles per hour on the highway. So if Ms. Hudson was in front of him and drove in front of him, she wasn't driving the speed limit. At bottom, though, the judge, misconduct occurred here. Under that test, the question is, was that serious enough to forfeit protection of the act? The judge never actually answered that question because that question has to be answered under the clear pine holdings test. You will not find an analysis in this decision about whether that misconduct reasonably tended to coerce or intimidate employees under the act. That's fundamental error, and this fourth decision must not be enforced. Okay. Thank you. Thank you. Case submitted. We'll call the next case, please.
judges: Tatel, Brown, Millett